IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:16-CR-00064 |
| | ) | Judge Anthony J. Trenga |
| MAHMOUD AMIN | ) | |
| MOHAMED ELHASSAN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION PAPER &
COMMENTARY ON SENTENCING FACTORS**

Defendant, **MAHMOUD AMIN MOHAMED ELHASSAN**, by and through his

attorneys, **THOMAS ANTHONY DURKIN** and **STUART A. SEARS,** pursuant to Rule 32(c)

of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in

*United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338 (2007), *Gall v.*

*United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Nelson v.*

*United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits

Defendant's Position Paper & Commentary on Sentencing Factors.[1]

## I.    INTRODUCTION

Needless to say, this is a difficult case.  And, as in most every case, sentencing is always

the most difficult issue.  As in most cases as well, the difficulty presented by this sentencing is the

quandary of trying to fashion a sentence under § 3553(a) that is "sufficient but not greater than

necessary" to comply with the multiple sentencing goals of federal sentencing set forth in §

3553(a)(2). This case, in particular, presents unusually enormous mitigation factors in the face of

---

[1] Certain sensitive, personal information has been redacted from this publically filed pleading. An un-redacted copy, along with Exhibits A-D, will be filed under seal with the Court.

admittedly quite serious criminal conduct concerning national security. Thus, there is no question that the Court must carefully balance these competing factors to arrive at an individualized sentence for this rather uniquely situated Defendant.

As the Presentence Investigation Report ("PSR") makes quite clear, notwithstanding these charges, Mahmoud Elhassan has lived a life of extraordinary hardship in the twenty-six years since his birth in Khartoum, Sudan. His early adolescence was marred by the physical abuse of his father, ████████████████████, and the uprooting of his life from the Sudan to Egypt at age nine. Mr. Elhassan's older siblings then emigrated to the United States, leaving the close siblings stranded on opposite sides of the world. Mr. Elhassan was eventually also able to come to the United States as a legal permanent resident, but just as his family had finally reunited, he lost his mother—███ ███████████████████████████████████████████████████████████████████████ ████████████. Then came further family crises and illness and a marriage proposal foiled by Mr. Elhassan's father-in-law to be. Dejected, confused, and terribly depressed, Elhassan turned for solace to the dangerously simplistic and naïve world-view of fundamentalist religion for comfort, guidance, and simplification to the terribly depressing and confusing situation he now found himself in as a young adult. This terribly misguided decision is one he now realizes was foolishly naïve and dangerous, and the direct result of his lack of critical thinking skills and failure to address his mounting emotional and mental health issues.

None of this—Mr. Elhassan's lack of critical thinking skills and severe emotional issues— is presented as an excuse for his conduct, for which Mr. Elhassan is horribly ashamed and remorseful. But this background adds needed context that, as will be set forth more fully below, is both relevant and persuasive with respect to the extremely mitigating factors the Court should take into account under 18 U.S.C. § 3553(a). This context also demonstrates the reasoning behind

counsel's recommendation that the Court impose a sentence of imprisonment in the range of 48 – 71 months—a range consistent with the sentencing guidelines calculations but for the draconian terrorism enhancement.  In reaching this recommendation, as will be explained more fully herein, counsel rely heavily upon the Report of Dr. Stephen N. Xenakis, attached hereto as Ex. A, who conducted three clinical interviews and examinations with Mr. Elhassan, and similarly concludes that Mr. Elhassan's undiagnosed and untreated psychiatric and medical conditions significantly contributed to his interest in religious fundamentalism and his participation in this offense. This too, weighs in favor of counsel's proposed disposition.  For all the reasons set forth below, including the fact that Mr. Elhassan will face near certain deportation at the conclusion of a custodial sentence, it is suggested that a sentence in the range of 48 – 71 months' imprisonment will be sufficient, but not greater than necessary to carry out each of the sentencing factors delineated in § 3553(a)(2).

## II.      THE PRESENTENCE REPORT AND SENTENCING GUIDELINES

Defendant has no objections to the Probation Officer's final PSR, other than to note for the Court the general clarifications which were set forth in the letter of February 7, 2017, which is attached hereto as Ex. B, and are not worth belaboring any further. However, it should be noted that counsel have objected to paragraph 45, p. 11 entitled "Offense Behavior Not Part of Relevant Conduct."

Counsel also have no technical objections to the Probation Officer's Guidelines Calculation—other than to state that the resulting Guideline range increased by the terrorism enhancement considerably overstates the seriousness of the offense and is unnecessarily punitive. The terrorism enhancement catapults Defendant to an Offense Level 37, and to Criminal History Category IV, notwithstanding Mr. Elhassan's zero criminal history points. This results in a

3

Guideline range of 360 months to life imprisonment—exceeding the applicable twenty-year (28) year statutory maximum.[2]

As the Court is certainly aware, however, since *United States v. Booker*, 543 U.S. 220, 264 (2005), the applicable Guideline range has been advisory rather than mandatory; and, even as advice, the Guidelines may be flawed, as the United States Supreme Court so held in *Nelson v. United States*, 555 U.S. 350, 351 (2009) ("[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable"); *see also*, *Gall v. United States*, 552 U.S. 38, 49-51 (2009)(holding that the Federal Sentencing Guidelines merely serve as a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence).

Counsel do not dispute the applicability of the terrorism enhancement as a matter of law. However, the Court maintains the authority to determine that the terrorism enhancement and resulting criminal history category over-represents Defendant's criminal history. *See* § 4A1.3(b)(1)("[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."). Indeed, counsel are mindful this is precisely what the Court did at the sentencing hearing for Defendant Farrokh, the principal in this aiding and abetting conviction, when it decided that Criminal History Category II better represented Farrokh's minimal criminal history than a Category VI.  TR. 7.15.16, p. 33.  Along these very same lines, counsel submit that Criminal History Category VI also over-represents Mr. Elhassan's criminal history, who would otherwise be a Criminal History Category I.

---

[2] Due to the statutory maximum of twenty-eight years' imprisonment, the resulting Guideline is capped at 336 months' imprisonment.

The terrorism enhancement in § 3A1.4 also provides for a twelve-point enhancement to the offense level.  Taking into account this severe enhancement, counsel reluctantly concur with Probation that Mr. Elhassan has a Total Offense level 37.  Combined with a Criminal History Category VI, the calculation results in an advisory guidelines range of 360 months to life—which must be reduced to 336 months' imprisonment due to the statutory maximum penalties.  However, after considering the offense conduct, because this enhancement is not empirically based, and automatically places Mr. Elhassan's guideline range beyond the statutory maximum sentence without regard to the specific nature of his conduct, counsel submit that this Court should impose a below-guidelines sentence.[3]

In different, but analogous contexts, many courts have disagreed with sentencing guidelines that were not the result of the Sentencing Commission's core function; *i.e.*, assigning guideline levels based upon conclusions and data compiled from a statistically significant number of cases—and rather, as here, based upon specific Congressional directives to the Commission to amend the guidelines without assessment that such revisions are necessary or warranted. *See e.g., Kimbrough v. United States*, 522 U.S. 85, 109 (2007)(holding the crack/cocaine guideline does not exemplify the Sentencing Commission's exercise of its characteristic institutional role); (*United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010) ("[the child pornography guidelines] [R]outinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases…An ordinary first time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction.").  Along similar lines, courts

---

[3] Without the terrorism enhancement, Mr. Elhassan's total offense level would be a level 25, which when combined with a criminal history category I, would result in an advisory guidelines range of 51 – 71 months' imprisonment. It is this range which informs counsel's recommendation of a sentence in the range of 48 – 71 months.

have also disagreed with the career offender guidelines. *See, e.g.*, *United States v. Patzer*, 548 F.Supp.2d 612, 617 (N.D. Ill. 2008); *United States v. Whigham*, 754 F.Supp.2d 239, 247–48 (D. Mass. 2010); *United States v. Naylor*, 359 F.Supp.2d 521, 524 (W.D. Va. 2005); *United States v. Carvajal*, 2005 WL 476125, at *5 (S.D. N.Y. Feb. 22, 2005).

The terrorism enhancement raises similar concerns.  In his thoughtful concurring opinion in *United States v. Stewart*, Judge Calabresi of the Second Circuit wrote the following with respect to both the impact and application of the terrorism enhancement:

> When the terrorism enhancement is applied, it has dramatic consequences on the applicable Guidelines range because it automatically increases both the offense level of a crime and the defendant's Criminal History Category. In Stewart's case, for example, the recommended sentence range without the enhancement was 78 to 97 months, while the imposition of the enhancement resulted in a recommended sentence of 360 months, the statutory maximum…. When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential.  Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*…

*United States v. Stewart*, 590 F.3d 93, 153 – 154 (2nd Cir. 2009).  Counsel agree with this thoughtful approach and submit that in this instance, there are compelling reasons this Court should exercise its discretion to depart from the harsh sentencing consequences under the guidelines and impose a below-Guidelines sentence in the range counsel have suggested.  *See also*, *United States v. Khan*, 14-cr-564 (N.D.Ill.)(imposing below-guidelines sentence of 40 months' imprisonment for conviction under § 2339B, where guideline range exceeded the statutory maximum sentence of 180 months); *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ("We agree with the district court, however, that the 12 level increase to Mandhai's offense level required by the terrorism enhancement prevents the penalty from fitting the crime."); *United States v. Conley*, 13-cr-00163 (D.Colo.) (imposing below-guidelines sentence of 48 months' imprisonment for conspiracy to provide material support to ISIS, despite guideline range of 292 – 365 months'

imprisonment); *United States v. Wolfe*, 14-cr-00213 (W.D.Tex.)(imposing below-guidelines sentence of 82 months' imprisonment on conviction for attempting to provide material support to ISIS, where the guideline range exceeded the statutory maximum sentence of 180 months); *United States v. Brown*, 14-cr-58 (E.D.N.C.) (imposing below-guidelines sentence of 92 months' imprisonment for conviction of conspiracy to provide material support to terrorists under 18 U.S.C. § 2339A, where guideline range exceeded the statutory maximum sentence of 180 months' imprisonment).

## III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND HISTORY AND CHARACTERISITCS OF DEFENDANT UNDER § 3553(a)

To arrive at a just sentence that is "sufficient but not greater than necessary," the Court must consider the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, and the history and characteristics of the Defendant. § 3553(a)(1).[4] Attempting to provide material support to a Designated Foreign Terrorist Organization as awful as ISIL is without question a very serious offense, and the facts and circumstances of Mr. Elhassan's offense conduct have already been clearly set forth in the PSR, Defendant's Affidavit submitted at his change of plea (Dkt. 41), and the documents submitted by the government.  Succumbing to the lure of the violent ideology of ISIL under the auspices of religious obligation is indeed most serious, and neither counsel nor the Defendant suggest otherwise.

---

[4] 18 U.S.C. § 3553(a) *Factors to be considered in imposing a sentence*, provides as follows: The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and, (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and, (7) the need to provide restitution to any victims of the offense.

However, and not to diminish the very seriousness of this offense, the timing and particular circumstances of Mr. Elhassan's conduct when viewed in the context of the emotional upheaval he was experiencing at the time of the offense, particularly his undiagnosed and untreated depression, posttraumatic stress disorder, and perfect storm of tragic family circumstances can explain—but cannot justify—how he was drawn into such a simplistic and naïve fundamentalist worldview at the heart of the resulting conduct.  To understand how this became possible one only has to understand Mr. Elhassan's tragic upbringing.

Mr. Elhassan was born in Sudan to his parents Amin Elhassan and Fatima Ibrahim. PSR, p. 12, ¶ 53.  One of nine siblings, Mr. Elhassan had an extremely unstable childhood. Though his father Amin was a goldsmith in Sudan who could provide for the family, he was very violent and strict—inflicting corporal punishment on the children, including Defendant, and abusing his wife. *Id*.  The heartbreaking circumstances of Mr. Elhassan's childhood, including routine beatings, are recounted in detail in the many character letters submitted my family and friends.[5]

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████. Fatima convinced her husband that Mr. Elhassan required medical attention which was not available in Sudan. His mother and siblings, including Defendant, never returned to Sudan. *Id*.

---

[5] The letters are attached hereto as Ex. C.

The time in Egypt was particularly straining on Mr. Elhassan and his siblings. The whole family lived in a small apartment with their mother, and finances were extremely tight.  However, one by one, Mr. Elhassan's older siblings began emigrating to the United States. First his eldest brother, Mohammad, next the eldest sister, Reem, and so on. In Cairo, Egypt, Fatima struggled to make ends meet. She sought out assistance from the United Nations, and was able to get Mr. Elhassan enrolled in a refugee school, provided by St. Andrews Refugee Services.  PSR, p. 13, ¶ 57, 58.  Despite the harsh circumstances of life in Cairo—including several beatings by South Sudanese students who targeted Mr. Elhassan because he originates from Northern Sudan—Mr. Elhassan enjoyed school and took extra courses to learn the English language.  At age fifteen, he took up a job to help his mother pay the bills.  By the time Mr. Elhassan finished high school though, Fatima Elhassan became very ill.  In 2009, she traveled to the United States, and was diagnosed with pulmonary fibrosis. PSR, p. 13, ¶ 59.  During her six-month absence, Mr. Elhassan—only eighteen years old—was put in charge of caring for his younger siblings left behind in Cairo. From 2010 to 2011, Mr. Elhassan studied Arabic at the prominent Al-Azhar University in Cairo. PSR, p. 15, ¶ 69.[6]  In August of 2011, Fatima Elhassan again returned to the United States, and by June of 2012, she was able to obtain U.S. Permanent Residency cards for Mr. Elhassan and his siblings, and the family re-united in the United States. PSR, p. 14, ¶ 60.

But the stress of his mother's chronic illness weighed heavily on Mr. Elhassan. By March of 2014—shortly before Mr. Elhassan's first meeting with Defendant Farrokh in the summer of 2014—his mother had already become hospitalized, where she remained until her relatively sudden death in September 2014, at age 57. This event had devastating effects on Mr. Elhassan's emotional and mental state. As is evident from the PSR, Dr. Xenakis' Report, and the letters from

---

[6] When he eventually made it to the United States, Mr. Elhassan also enrolled in courses in Math, English, and Information Technology at Northern Virginia Community College. PSR, p. 15, ¶ 69.

family, Mr. Elhassan had a very special relationship with his mother.  Her untimely death just prior to the time of this offense significantly contributed to his poor mental state, and compounded his depression and existing psychological trauma. Dr. Xenakis' Report describes the impact of this death on Elhassan as follows:

> Mr. Elhassan's mental state worsened with his mother's terminal illness and death that deprived him of the singular supportive and protective figure in his life, █████████████████████████████████. His relationship with his mother was complicated by the disparagement over her daughter's behavior and holding him responsible to discipline. His depression and anxiety worsened dramatically after his mother's death and informed his actions and relationships leading up to the charged events…. █████████████████████████████████, posttraumatic stress disorder, major depression, and postconcussion syndrome, complicated by chronic renal disease, contributed to the desperation he felt after his mother's death and adversely informed his activities and relationships.

Xenakis Report, p. 6.

Courts have recognized that sentencing reductions may be appropriate where a defendant suffered the early loss of a parent or the recent death of a family member. *See, e.g., U.S. v. Collington*, 461 F.3d 805 (6th Cir. 2006); *U.S. v. Castillo*, 2007 WL 582749 (S.D.N.Y. Feb. 26, 2007). *See also,* the policy statement at U.S.S.G. § 5H1.3, Mental and Emotional Conditions ("Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."). Such a reduction is appropriate here considering Mr. Elhassan's close relationship with his mother, the effect of her death on his mental state, and the proximity of these events to the offense conduct.  Mr. Elhassan's extremely difficult upbringing also weighs in favor of a reduced sentence, ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████.

Mr. Elhassan's continued family crises only intensified after the death of his mother in September of 2014.  In November of 2014, a contentious family argument among the still grieving siblings caused Mr. Elhassan's eldest sister, Reem, to leave the family's shared home in suburban D.C. and move into a family friend's apartment in D.C.  By late February 2015, Reem herself began dialysis due to kidney failure.  ███████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████.  Mr. Elhassan's personal pain and combined family anguish became too much to bear ████████████████████, and around this time he briefly left the D.C. area and stayed with a friend in Philadelphia. To make matters even worse, by June of 2015 the stress of Mr. Elhassan's personal situation lead to his own hospitalization for kidney failure. Only days later, Reem underwent kidney transplant surgery, accepting a kidney from Mr. Elhassan's eldest brother.

Compounding his family turmoil, around the same time Mr. Elhassan also entered his first intense romantic relationship with a Somali woman in Atlanta, which ended badly.  In August of 2015, his marriage proposal to the young woman in Atlanta was unexpectedly rejected by the woman's father, after Mr. Elhassan traveled to Atlanta to seek permission for the marriage. The father did not believe that a man from Sudan was an acceptable husband for his daughter.  This greatly worsened Mr. Elhassan's already fragile mental state.  Dr. Xenakis explains that during this time:

> [Mr. Elhassan's] depression worsened to its deepest lows, and he was overwhelmed
> with sadness, ruminations, and anxiety.  His daily routine after breaking up with
> [the woman] in September 2015 involved staying at home and working

> occasionally. He developed severe sleep difficulties, not falling asleep until 3 – 4
> AM and then awakening in the mid-afternoon but not feeling rested.

Xenkis Report, p. 5.  His family crises and the loss of his relationship drew Mr. Elhassan further into strict religious devotion as a cure for his depression. Indeed, shortly after the dissolution of his relationship, Mr. Elhassan and a few friends started a *Da'wah* prayer table at the Verizon Center to proselytize the Islamic faith to the District of Columbia public. This faith community provided Mr. Elhassan with a much needed sense of purpose and comradery. Needless to say, however, it did nothing to enhance his critical thinking skills or to resolve his increasingly severe depression.

As set forth in Dr. Xenakis' report, Mr. Elhassan can readily be seen to be suffering then, and he continues to suffer from, Major Depressive Disorder with Anxious Distress; Posttraumatic Stress Disorder; and Mild Neurocognitive Disorder Due to Traumatic Brain Injury. Xenakis Report, p. 7.  These diagnoses are highly relevant to the mitigation of the circumstances of the offense conduct in several respects. First, according to Dr. Xenakis' analysis, Mr. Elhassan's articulated "thoughts and expressions of martyrdom are consistent with a man suffering from severe depression and chronic posttraumatic stress disorder." Xenakis Report, p. 6. These feelings of loneliness and desperation are evident in the documents the government provided to counsel in support of its sentencing position, and provide meaningful context to the otherwise disturbing contents. For example, in one communication, Mr. Elhassan wrote the following:

> Please connect me to [radical men living the U.S] by Allah I am feeling alone and
> I don't have anyone but the brothers on the internet and they might be infidel
> intelligence or they might be good brothers.

These communications, and the many others like them during the offense,[7] underscore Mr. Elhassan's depression and increasing frustration. Dr. Xenakis explains the influence of Elhassan's

---

[7] The government provided a number of Defendant's communications to counsel in support of its sentencing position. The communications are not Bates labeled and are somewhat cumbersome; however, counsel will refer to these

depression on his beliefs and the offense conduct as follows:

> He felt deeply burdened by this emotional distress, but could not contemplate suicide because of religious prohibitions and finds solace in martyrdom. He writes of "feeling alone" (Document 1), feeling desperate about his living conditions (Document 2) and being confused (Document 5), commitment to his faith (Document 7 and 10) and a wish to being a martyr (Document 12). It has been commonly observed that young men in his predicament engage in self-destructive and ultimately fatal activities to end their suffering. Mr. Elhassan did not follow through with his ruminations over death, but did seek support and solace in this troubled time. He entered nefarious relationships with troubled and deceitful men, and was drawn into an ideology he otherwise would have had the capacity to wholly reject.

Xenakis Report, p. 6 – 7.

Desperation and alienation are not uncommon in ISIL cases—though Mr. Elhassan's is very amplified in light of his diagnosis. *See, Case by Case: ISIS Prosecutions in the United States*, Center On National Security at Fordham Law, March 1, 2014 – June 30, 2016, http://news.fordham.edu/law/center-on-national-security-releases-report-on-isisprosecutions/. ("Overall, there is a sense of identity crises and alienation from society across the wide range of [ISIS] cases.").

Moreover, though the communications presented by the government are very troubling, Mr. Elhassan does express a significant degree of empathy in his communications—albeit misguidedly. For example, in one such communication provided by the government in support of its sentencing position, Mr. Elhassan writes, "Yes but akhi women are being raped there [in Syria]. I cant sit watching my sisters being raped." This sympathy, misguided or not, has been identified as a common factor among ISIL recruits. *See, e.g.*, Lorenzo Vidino and Seamus Hughes, *ISIS in America: From Retweets to Raqqa*, Program on Extremism, The George Washington University, p. 15. (In many cases an "underlying sense of sympathy and compassion appeared to play an

documents by the PDF label on the electronic documents provided (ELHASSAN SENT DOC 01, 02, 04, 05, 06, 07, 09, 10, 12, 16, 18, 19, CHART, and FB, respectively).

important role" in initially motivating the recruits to become interested and invested in the Syrian conflict.); *see also*, Testimony of Peter Bergen for the U.S. Senate Committee on Homeland Security and Governmental Affairs, *Jihad 2.0: Social Media in the Next Evolution of Terrorist Recruitment*, May 7, 2015 ("In the minds of ISIS' recruits, the group is doing something that is of *cosmic importance* that is sanctioned by Allah: defending Sunni Muslim civilians from the terrible onslaughts of the Assad regime, which has not hesitated to use chemical weapons in its war against its own people.")(emphasis in original), p. 7.

In this context, when coupled with the extraordinary emotional upheaval Mr. Elhassan was undergoing at the time, one can better understand how Mr. Elhassan was drawn in his crisis and despair to ISIL's simplistic credo—not to mention the slickness of ISIL's propaganda on social media.[8]

Mr. Elhassan's health concerns can also be taken into account in fashioning an appropriate sentence. Sentencing courts may impose below-guidelines sentences based on the nature of the defendant's health, and court can consider the need for the sentence imposed to provide medical care in the most effective manner under § 3553(a)(2)(D). *United States v. Smith*, 590 F.3d 570, 575 (8th Cir. 2009) (noting that the district court imposed a below-guidelines sentence, in part, because of the defendant's "poor health"); *United States v. Kemph*, 317 Fed. Appx. 342, 343 (4th Cir. 2009) (noting that the district court imposed a below-guidelines sentence, in part, because of the defendant's "significant health issues").

---

[8] In his September 24, 2014, speech at the United Nations, President Obama implored the international community to take steps to "contest the space that terrorists occupy, including the Internet and social media," noting that ISIL propaganda "has coerced young people to travel abroad to fight their wars, and turned students—young people full of potential—into suicide bombers. We must offer an alternative vision." https://obamawhitehouse.archives.gov/the-press-office/2014/09/24/remarks-president-obama-address-united-nations-general-assembly.

As noted in Dr. Xenakis' report and the PSR, Mr. Elhassan also has a number of other health issues. At age 14, Mr. Elhassan suffered a "serious concussion and intracerebral hemorrhage," as well as fractures of the right femur and right arm, after being hit by a car as he was walking home from school in Egypt. Xenakis Report, p. 4; PSR, p. 15, ¶ 64.  The accident resulted in a coma, and Mr. Elhassan was hospitalized for seven months.  *Id.*  He also developed cognitive problems for several years after the accident and did not walk for nearly 2 years—all of which required extensive rehabilitation. Xenakis Report, p. 4.

Mr. Elhassan also has documented kidney and liver issues like other members of his family—as had already been noted. Since age nine, he has had blood in his urine and high liver enzymes. PSR, p. 15, ¶ 65.  He has been hospitalized in Sudan for this issue, and was also hospitalized in the United States six months prior his arrest for similar problems including pain in his side and blood in his urine. PSR, p. 18.  During his most recent hospitalization, he was diagnosed with rhabdomyolysis and hematuria. *Id.* However, Dr. Xenakis has concluded that Mr. Elhassan may well suffer from chronic renal disease.  Xenakis Report, p. 6.  Whatever the cause, these issues will require careful monitoring and treatment in the Bureau of Prisons—and weigh in favor of a below-Guidelines sentence.

## IV.   THE LIKELIHOOD OF DEPORTATION WEIGHS IN FAVOR OF A BELOW-GUIDELINES SENTENCE; AND REFLECTS THE SENTENCING GOALS OF 18 U.S.C. § 3553(a)(2)(A)-(D)

Mr. Elhassan faces near-certain deportation at the conclusion of any custodial sentence imposed by the Court. *See* 8 U.S.C. § 1227(a)(4)(B) (*Terrorist activities*), providing that that "any alien who is described in [INA § 212(a)(3)(B) or (F)] is deportable;" *see also* 8 U.S.C. § 1182(a)(3)(B) (broadly defining "terrorist activities").  In that Elhassan has Sudanese citizenship, the U.S. will surely seek Elhassan's deportation to Sudan, where he has not lived since age nine.

The sheer severity of this consequence is extremely relevant to the Court's consideration of an appropriate sentence, and weighs in favor of a below-Guidelines sentence in this instance.

First, deportation on the grounds faced by Mr. Elhassan entails further mandatory detention and imprisonment—even if Elhassan were to agree to an order of removal and waive the proceedings.[9]  In general, a deportable noncitizen with a valid passport who accepts a final order of removal and agrees to waive the proceedings before an Immigration Judge can be removed to his/her home country in as much time as it takes Immigration and Customs Enforcement/Enforcement and Removal Operations ("ICE/ERO") to complete the necessary paperwork, get necessary approvals from the home country, and make arrangements for the trip. However, Elhassan's terrorism conviction is likely to slow this process by months—as Sudan could well resist Elhassan's return, refuse to authorize the removal, or simply delay.[10]

Although the United States has rather extraordinary power in insisting that a country cooperates in accepting the return of its citizens by threatening to halt the issuance of visas or humanitarian relief to that country, that factor holds much less weight in Sudan. Sudan is one the notorious seven countries identified in President Trump's recent, controversial Executive Order *Protecting The Nation From Foreign Terrorist Entry Into The United States*, dubbed the "Muslim Ban," placing a 120-day moratorium on the refugee resettlement program, and otherwise suspending the entry of immigrants and non-immigrants from the seven countries ninety days from the entry of the order.[11] Moreover, according to recent reports, Sudan is also on a list of countries

---

[9] Removability under 8 U.S.C. § 1227(a)(4)(B) subjects an individual to mandatory detention. See 8 U.S.C. § 1226(c)(1)(D).

[10] Sudan may also be able to resist or delay Elhassan's deportation on the grounds that his mother was born in Egypt, and he spent much of his life in Egypt, as opposed to the Sudan.

[11] As the Court is no doubt aware a nation-wide stay of this Executive Order was issued in *Washington v. Trump*, and was recently affirmed by the 9th Circuit Court of Appeals when that court denied the government relief from the district court's stay. *Washington v. Trump* 2017 WL 526497 (9th Cir. 2017). However, President Trump has publically vowed to take further executive action in this regard, including issuance of a new Executive Order in a matter of days. *See* Matt Zapotosky, *Trump says he'll issue a new executive order by next week*, WASHINGTON POST, February

deemed by the federal government to be "uncooperative" in taking back their deported citizens from the United States. *See,* Stephen Dinan, *Law allows Trump to refuse visas to 'uncooperative' countries that won't take back deportees*, WASHINGTON TIMES, February 14, 2017 ("A federal law says the government can stop issuing visas to countries that are deemed 'uncooperative' because they refuse to take back their citizens when the U.S. tries to deport them. At least five of the seven countries targeted by the Executive Order – Iran, Iraq, Libya, Somalia and Sudan – are already on that list, according to new data obtained by the Immigration Law Institute.").  This diplomatic dust up and the uncertainty caused by the Executive Order is good cause to expect significant delays in Defendant's deportation—resulting in his continued detention.

There is also very little reason to expect that Mr. Elhassan would be successful in petitioning for relief from deportation. There only appears to be two narrow legal avenues available for relief; though only one avenue could be said to be available to Mr. Elhassan. The first is an extremely rare waiver provision under 8 U.S.C. § 1182(d)(3)(B)(i), which allows the Secretary of State, after consultation with the Attorney General and Secretary of Homeland Security, the discretion to grant a waiver of the terrorism-related grounds of inadmissibility.  However, this waiver cannot be granted during removal proceedings. It can only be sought after such proceedings have concluded or have been terminated by an Immigration Judge or the Board of Immigration Appeals. *See* 8 U.S.C. § 1182(d)(3)(B)(i) ("The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.").  The second, and only potentially viable avenue, is to petition an Immigration Judge for relief from deportation under the Convention

---

16, 2017. Suffice it to say, the litigation on the Executive Order is far from over, as full briefing on the State of Washington's constitutional claims challenging the Executive Order has not yet taken place.

Against Torture.[12] *See* 8 C.F.R. § 208.17 ("Deferral of removal under the Convention Against Torture").  Elhassan would have to demonstrate a clear probability that he would suffer torture at the hands of the Sudanese government, or with the government's consent or acquiescence, if he were returned. However, because he would be subject to mandatory detention by ICE throughout these proceedings, even in the best case scenario if he were successful and obtained relief, he would be imprisoned beyond the conclusion of a custodial sentenced imposed by this Court during the pendency of the removal proceedings.

The likelihood of Elhassan's deportation, and the concomitant prolonged detention is most certainly a relevant factor for the Court to consider when determining a sentence sufficient but not greater than necessary. Deportation mitigates the amount of imprisonment necessary to punish a defendant, because deportation is significant punishment unto itself, and because it mitigates the need to impose a long prison sentence for the public's protection. *See, e.g.*, *Jordan v. De George*, 341 U.S. 223, 232 (1951) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.").  His deportation therefore promotes and reflects several of the other the sentencing goals of 18 U.S.C. § 3553(a)(2)(A)-(C) in that deportation—which would separate Mr. Elhassan from his entire immediate family in the U.S.—reflects the seriousness of the offense. It can also be said to promote respect for the law and to provide just punishment for the offense. It goes almost without saying that given the choice between serving a longer prison sentence and remaining in the U.S. or returning to Sudan where he left as a nine-year old, the decision would be an easy one to make.  But Mr. Elhassan will not get that choice.  This very severe consequence also addresses the Court's need to fashion a sentence

---

[12] United Nations Convention Against Torture ("CAT") is implemented in the Foreign Affairs Reform and Restructuring Act of 1998 (codified at 8 U.S.C. § 1231 note).

which provides general deterrence. No one can possibly suggest that banishment from his entire family in the U.S. to, essentially, a life of exile in Sudan is not something that the public will perceive as a harsh consequence of this conviction. Such a consequence can also be said to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

The consequence of deportation also has implications for Mr. Elhassan's conditions of confinement, and courts have also imposed below-Guidelines sentences based upon the recognition that aliens face more severe restrictions in prison than non-aliens. *See e.g.*, *U.S. v. Pacheco-Soto*, 386 F. Supp. 2d 1198 (D.N.M. 2005) (deportable alien convicted of drug crime sentenced to 60 months, rather than minimum guideline term of 74 months, in light of his ineligibility for early release, minimum security prison, or credits for participation in residential drug or alcohol abuse program).

## V.   **CONCLUSION**

In the thirteen months since his arrest, Mr. Elhassan has had plenty of time to think about the problems that caused him to be in the serious predicament he now finds himself.  He has done his best under the circumstances of his confinement to adjust his thinking; and is willing to follow any further education, therapy, or treatment that can be provided in the Bureau of Prisons.[13] A sentence in the range suggested of four to six years can hardly be said to be a lenient sentence for a first time offender—particularly one with the complex personal issues facing Mr. Elhassan at the time of the offense. He is truly a different man today, and one truly deserving of a second chance at a productive life, albeit in Sudan. He stands fully willing to accept responsibility for this offense

---

[13] *See, e.g*, the Life Skills and Public Speaking certificates he has earned while incarcerated, attached hereto as Group Ex. D.  However, whether any programs such as have become known as "Countering Violent Extremism" ("CVE") are available in the Bureau of Prisons is another matter. *See generally, Countering Violent Extremism (CVE): A Resource Page*, BRENNAN CENTER FOR JUSTICE, October 5, 2016, https://www.brennancenter.org/analysis/cve-programs-resource-page (collecting articles). *See also*, Dr. Xenakis' Report, p. 8.  Mr. Elhassan "requires counseling, therapy, and treatment" as a consequence of these factors."  Importantly, Mr. Elhassan "appears quite willing to continue with the therapy and treatment that would be necessary to ensure his rehabilitation." *Id*.

and is equally willing to accept the judgment of the Court. Mr. Elhassan, as well as his counsel, ask only that the Court temper its judgment with mercy. He is well deserving of mercy from the many hardships he has already had to endure in his relatively young life, and the many hardships facing him in the Sudan.

Respectfully submitted,


/s/ Stuart A. Sears
**STUART A. SEARS** (Va. Bar. No. 71436)
SCHERTLER & ONORATO, LLP
1101 Pennsylvania Avenue, NW, Suite 1150
Washington, DC 20004
Tel: 202-628-4199
ssears@schertlerlaw.com

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**
(Admitted *Pro Hac Vice*)
DURKIN & ROBERTS
2446 N. Clark Street
Chicago, IL 60614
Tel: 312-913-9300
tdurkin@durkinroberts.com

*Attorneys for Defendant.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of February, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties involved in the case.

/s/ Stuart A. Sears

**STUART A. SEARS**
575 7th Street NW
Suite 300 South
Washington, DC 20004
Tel: 202-628-4199
ssears@schertlerlaw.com
