IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16cr00064 (AJT) |
| | ) | |
| MAHMOUD AMIN MOHAMED ELHASSAN | ) | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING
**(Revised with Exhibits and Exhibit Citations)**

*The establishment of the governance of Allah on earth will be achieved only by fighting in the name of Allah.* (Ex. A)

> *Mahmoud ElHassan, September 13, 2013*
> *Using his pseudonym Mahmoud Al-Dongulawi IV*

*I asked you about Al-Nafeer[1] about a month ago on your previous account sheikh.   Praise be to Allah here with you is a sleeper cell.   Sheikh pray for us for success and rewards.* (Ex. C)

> *Mahmoud ElHassan, June 20, 2014*

*My doctrine is short: I believe the man made laws and constitution are pure Shirk[2] and Kufr.   I believe whoever implements or make these constitutions and laws is Kaafir.   I believe the armies that protect those constitutions and laws are in general apostate armies.   I believe after mentioning these points that Muslims need to fight these apostate armies and governments, remove the Shirk of constitution and establish the Shari'ah.* (Ex. D)

> *Mahmoud ElHassan, December 23, 2014*

*Allah commanded us to fight- and fighting is not throwing candies but necks being chopped off and stomachs being slashes (sic) and eyes poked!* (Ex. E)

> *Mahmoud ElHassan, May 3, 2015*

*To live for Allah and die for Allah.* (Ex. F)

> *Mahmoud ElHassan, September 7, 2015*

---

[1] Al-Nafeer is a reference to violent jihad, or a call to mobilize. For an example of its usage: In or about June 2014, Al-Qaeda's media arm, as-Sahab, introduced a new publication called "Al-Nafeer", and in the first issue, renewed the group's pledge of allegiance to Afghan Taliban leader Mullah Muhammad Omar, and greeted fighters all over the world. *https://ent.siteintelgroup.com/Jihadist-News/as-sahab-introduces-new-publication-al-nafeer.html*

[2] In Islam, shirk is the sin of practicing idolatry or polytheism, *i.e.* the deification or worship of anyone or anything other than the singular God, *i.e.* Allah. Literally, it means ascribing or the establishment of "partners" placed beside God. *https://en.wikipedia.org/wiki/Shirk_(Islam)*

## I.      INTRODUCTION

The government's sentencing position is this case is driven by the defendant's conduct furthering the objectives of the Islamic State, and his own statements promoting his belief in violent Islamic Jihad. (See Ex. G.)   Further, the defendant recruited Joseph Farrokh to join the Islamic State and aided his efforts to travel to Syria and Iraq to join the terrorist organization. But for the FBI's intervention, the overwhelming evidence points to two eventual outcomes of the defendant's escalating conduct: (1) he planned to join Farrokh in Syria/Iraq at a later date, or (2) he envisioned himself as a "sleeper cell" or "lone wolf" actor supporting the violent jihadist cause. (See Ex. B)

In June 2014, the defendant corresponded with Sudanese cleric Sheikh Mohammed Ali al Jazouly[3] and promised to him "here with you is a sleeper cell." (Ex. C)   Six months prior to this the defendant opened a Facebook account characterizing himself in the same terms, with the Arabic words for "solo wolf" imposed over an image of a stalking wolf on his Facebook page. (Ex. B)   The United States has seen firsthand the horrific carnage wrought by "lone wolf" criminals acting in the name of Islamic terrorism: *See* Fort Hood, Texas; *See* Boston, Massachusetts; *See* San Bernadino, California; *See* Orlando, Florida.   This is the violent ideology the defendant believes.[4]   This is what drove him to seek out like-minded people to further his belief.

---

[3] Al Jazouly is a notorious cleric who promotes violent jihad.   After Osama bin Laden was killed, Al Jazouly released a sermon on May 29, 2011, entitled "who Betrayed and Killed Osama Bin Laden?   Further, after Abu Bakr al-Baghdadi anointed himself Caliph of the Islamic State, and declared war against western civilization, al-Jazouly publicly praised the speech as expressing "pearls of wisdom" and characterizing Baghdadi as the grandson of the messenger.

[4] Remarkably, the defendant has still not renounced the violent ideology to which he subscribes. In his acceptance of responsibility statement (PSR ¶32), the defendant states, "I accept full responsibility for my actions in this case.

As this Court is aware, the government's objective at sentencing is to make an individual assessment of each convicted defendant's conduct to arrive at a just punishment that serves the public safety interests of the United States pursuant to the parameters congress established in 18 U.S.C. § 3553(a).   The United States does not paint with broad strokes with respect to incarceration.   We take seriously our responsibility to follow the statutory guidance set forth in §3553(a).   The United States thoughtfully assesses the aggravating and mitigating circumstances of each defendant's conduct, and we understand that a sentence should be "sufficient, but not greater than necessary" [5] to comply with the four purposes of sentencing set forth in the statute. We place a strong emphasis on the nature and circumstances of the offense and the history and characteristics of the defendant. §3553(a)(1).   The government's sentencing evaluation appropriately begins with the benchmark provided by the United States Sentencing Commission, Guidelines Manual (U.S.S.G. or "Guidelines"), which are formulated by an independent agency operating within the judicial branch pursuant to congressional authority.   *See* Title 28, United States Code, Section § 991[6], *et seq.*   The Guidelines provides a "rough approximation" of what sentence will achieve the statutory objectives. *United States v. Kimbrough*, 552 U.S. 85, 89 (2007). But if the Court decides that a that a variance sentence is warranted, "he must consider

---

… I assisted my co-defendant's attempt to provide himself to a terrorist organization ("ISIL"). … I lied to them [FBI] about my knowledge of his trip and my involvement with helping him find a way to join the Islamic State." The defendant does not accept "full responsibility." This statement deflects responsibility to Joseph Farrokh.

[5] The "sufficient, but not greater than necessary" statutory language is not an "admonition to be lenient." *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1ˢᵗ Cir 2006). This sufficiency provision merely requires courts to impose a sentence that is consistent with the broad purposes in Section 3553(a)(2), most of which "hardly connote less punishment." *Id.*   The Fourth Circuit has subscribed to this same view of the sufficiency clause.   In *United States v. Smith*, 472 F.3d 222, 224-25 (4ᵀᴴ Cir. 2006), the defendant argued that because a sentence at the low end of the guidelines range would always be reasonable, a court may not impose any higher sentence under the "sufficient, but not greater than necessary" standard. The Fourth Circuit swiftly rejected this argument: "To hold that the lowest sentence in an applicable range is always sufficient would rob 3553(a) of its force." *Id.*

[6] The United States Sentencing Commission consists of seven voting members, at least three of whom shall be Federal judges. Title 28, United States Code, Section § 991(a).

3

the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 586, 597 (2007).

The recommended Guidelines sentence in this case is capped at the statutory maximum penalty, or 336 months.   The government submits that the defendant should receive a substantial period of incarceration and that a "sufficient" sentence is one that is rationally and reasonably compatible with the United States Sentencing Commission Guidelines recommendation.

It is with this understanding that the government seeks a substantial period of incarceration for this defendant.   As set forth in greater detail below and in the presentence investigation report, the defendant's clear radicalization towards violent jihad, his open willingness to provide support to ISIL, his expressed rejection of the rule of law and the norms of a civil society (*I believe the man made laws and constitution are pure Shirk and Kufr),* and his egregious lies to the FBI when confronted with his unlawful conduct, all warrant strong condemnation by the United States and by this Court.[7]

## II.        BACKGROUND and OFFENSE CONDUCT

### A.  The Defendant (*history and characteristics*).

The defendant arrived in this country on or about June 1, 2012, after his mother obtained a U.S. permanent resident card on his behalf.   The defendant's mother, who has since passed away, was originally from the Sudan, but moved her family to Egypt when the defendant was a child.   The defendant's mother emigrated to the United States several years ago and gained legal

---

[7] 18 U.S.C. 3553(a) requires the court to consider, among many other factors, how the particular sentence will "promote respect for the law." *See* 18 U.S.C. 3553(a)(2)(A).   The government submits that this factor has particular weight in this case: (1) the defendant has associated himself with a violent terrorist group that rejects the rule of law; (2) the defendant has expressed contempt for the rule of law and he has engaged in conduct demonstrating disdain for the rule of law; and, (3) the United States Sentencing Commission condemns this conduct in appropriately harsh terms, which has the added benefit of accurately reflecting public sentiment towards these terrorism crimes.

4

permanent resident status for herself.   She subsequently sought and received U.S. permanent resident cards for many of her children, including the defendant.   The defendant was 22 when he entered the United States.   The defendant was 25 when he was arrested for these offenses.

The defendant was radicalized towards violent jihad either before he arrived in the United States or shortly after arriving in the United States.[8]   The defendant used various internet and social media sites to support and espouse violent jihad.[9]  PSR ¶11. (Ex. I)   He publicly expressed in graphic terms his support for violent jihad.   The defendant did not just talk the part of a violent radical, he acted upon it as well. He sought out Cooperator 1, who the defendant knew to be a significant figure of on-line Islamic radicalization. He sought out Sudanese cleric Sheikh al-Jazouly and expressed his desire to be a "sleeper cell."   He bragged to Joseph Farrokh about his contacts with Sheikh al-Jazouly.   The defendant encouraged and arranged for Joseph Farrokh to leave his family and attempt to travel to Syria and Iraq to join the Islamic State.

The defendant has engaged in a pattern of criminal, anti-social activity in three years in the United States.   The defendant has no respect for the rule of law.   He expressly rejects the rule of law.   When confronted with his conduct, his first, second and third reactions were to lie. The defendant also defrauded DC Medicaid in the amount of $22,148.00 by falsely claiming a

---

[8]  In a Facebook posting in 2013 using his pseudonym Mahmoud Al-Dongulawi IV, the defendant posted a message praising Sami Osmacak as one of our "forgotten prisoners."   The defendant continued: "I saw this brother in 2009 on youtube and I wished to work with him one day, but the 1st day I came to the states I found that the disbelievers imprisoned him. May Allah release you akhe fe Allah." (Ex. H)

[9]  The Islamic State's adherents and followers actively use the internet and social media sites to incite terrorist activity and promote "lone-wolf" actors throughout the world, including within the United States.   Strategically, propaganda production and dissemination is equally important to military jihad with respect to the terrorist organization's goals and objectives.   *See Media Jihad: The Islamic State's Doctrine for Information Warfare, Charlie Winter, The International Centre for the Study of Radicalisation and Political Violence.*   Found at http://icsr.info/category/publications/.

D.C. residence so he could receive medical treatment for injuries sustained because of a "new strenuous exercise program."   PSR ¶ and PSR page 11 (*New Information*).

The presentence report reflects that the defendant endured an abusive upbringing, albeit with a father who was a well-established goldsmith who provided well for his family.   PSR ¶¶ 53-54.   Any incidence of childhood abuse is sad and heartbreaking, and this defendant is no different.   However, childhood abuse cannot be an excuse for aligning with and supporting a terrorist organization.   Tens of thousands of victims of childhood abuse lead quiet lives dealing with their abuse without ever giving a thought to committing a crime, let alone a crime of terrorism.   Drawing a causal connection between childhood abuse and terrorism does a grave disservice to victims of child abuse.

Finally, the defendant is likely to argue that his conduct was in some way "impulsive." This claim is flatly rejected by the factual record in this case.   The defendant engaged in escalating conduct over a period of 18 months.   This conduct was deliberate, thoughtful, and planned -- everything but impulsive.   The defendant argues that there are insufficient services available to him within the Bureau of Prisons.   Once again, this is incorrect.   The Bureau of Prisons' website sets forth the mental health and other services available to prisoners.   The defendant also argues that his near "certain" deportation should factor in the courts decision-making.   Immigration consequences are purely collateral matters to the sentencing analysis, and find no support in the Section 3553(a) factors.

**B.  The Terrorist Organization.**

The defendant has pled guilty to aiding and abetting the provision of material support to a designated foreign terrorist organization, to wit: the Islamic State.   In addition, he has pled guilty to providing false statements to the FBI about his conduct.   In order to understand the gravity of the defendant's conduct, it is important to provide the proper context for the terrorist group he supported.

The Islamic State is led by Abu Bakr al-Baghdadi.   Mohamad al-Adnani served as the terrorist organization's chief spokesman and as a top advisor to Baghdadi.   Adnani was killed in 2016.  Baghdadi was declared a specially designated global terrorist by the Department of State on October 4, 2011.   In a rare public address on July 5, 2014, within a mosque in Mosul, Iraq, Baghdadi declared the Islamic State a caliphate and he anointed himself the Caliph, or leader, of the organization.   The objective of the terrorist organization is the forcible acquisition of land for the stated goal of creating an Islamic State without recognizing any national boundaries. The terrorist organization seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community.   On September 22, 2014, the organization released an audiotape of a speech by Adnani in which he states, on behalf of the FTO, " … if you can kill a disbelieving America or European … then rely upon Allah and kill him in any manner or way however it may be.   Smash his head with a rock, or slaughter him with a knife, or run him over with your car, or throw him down from a high place, or choke him, or poison him."   Adnani concludes by stating "you have realized the threat of the Islamic State."

The Islamic State is a barbaric terrorist organization committed to the slaughter of the *kuffar* (non-Muslims).   The Islamic State widely promotes its unique brand of savagery and perverted ideology through conventional media sources and modern social media outlets.   The terrorist organization has publicly distributed its videotaped beheadings of American journalists and humanitarian aid workers.   The terrorist organization torched a foreign soldier held captive in a cage and distributed the video of his brutal death.   The Islamic State promotes and engages in the widespread rape and enslavement of women belonging to a religious minority in Iraq and Syria.   The Islamic State slaughters thousands of males within the same religious minority.   The terrorist organization's savagery does not respect any boundaries, moral or geographic, and the organization continues to promote and inspire violent acts, including acts committed within the United States.

### C.  The Offenses

The defendant was radicalized before he met Joseph Farrokh.   The introductory statements of the defendant demonstrate this.   In 2014, the defendant created a Twitter account for himself under the pseudonym @Loverofhooreen.   On March 12, 2014, the defendant tweeted, "the day you die on the sake of Allah is the da you are born somewhere else."   Two days later, the defendant retweeted photos of a lion and terrorist heroes, including Osama bin Laden, Anwar Aulaki, and Abu Musab Al-Zarqawi.   On March 16, 2014, the defendant retweeted a photo of dozens of men waving the black jihad flag, with the caption "hey Obama!! We are all sheikh Osam, we are all Sheikh Baghdadi."

8

Mahmoud Elhassan became friends with Joseph Farrokh in March 2015 and their friendship, and criminal activity, deepened after the defendant attended Farrokh's wedding in August 2015.   From August 2015, until their subsequent arrests, the defendant and Farrokh spoke openly with each other about supporting the Islamic State and supporting violent jihad.   The co-defendants watched videos online that glorified terrorism in support of Islam, such as videos depicting sermons by Anwar Awlaki. The co-defendants discussed the contents of the videos and supported the ideology promoted in the videos.   Elhassan educated Farrokh about the sermons of a radical Sudanese cleric who supported the Islamic State. PSR ¶12.

In the late summer of 2015, Farrokh talked more seriously with his co-defendant about traveling overseas and joining the Islamic State.   On October 2, 2015, in a conversation about events in Syria, Farrokh told the defendant that he had no patience and that he wanted to go right away and "chop their heads."

On December 9, 2015, Farrokh told the defendant that he had recently submitted his two-week notice at work in preparation for his travel to Syria in January 2016. Farrokh researched flights, possibly out of Richmond, Virginia, to avoid what Farrokh believed to be stricter law enforcement scrutiny at larger airports.   Farrokh told CHS #1 that he would send CHS #1 his flight information soon so that CHS #1 could assist Farrokh with his overseas travel plans.   On or about December 21, 2015, Farrokh finalized his travel plans by purchasing his airplane ticket for Jordan, departing January 15, 2016 from Richmond, Virginia, and connecting in Chicago, Illinois.

Shortly before 8:00 a.m., on January 15, 2016, the defendant picked-up Farrokh at his residence in Woodbridge, Virginia.   The co-defendants' plan included having the defendant drive Farrokh to a spot near the Richmond International Airport.   At a bathroom in Dale City, Farrokh shaved his beard in an effort to avoid scrutiny when he reached the airport.   After leaving Dale City, Elhassan drove southbound on Interstate 95 towards Richmond.   Upon reaching the vicinity of the Richmond International Airport, Elhassan and Farrokh stopped at a commercial and retail area approximately one mile from the airport. Elhassan and Farrokh stayed together at this commercial area for approximately two hours. At approximately noon, Elhassan call taxicab for Farrokh. Farrokh entered this taxicab which drove him the approximate one mile to the Richmond International airport. Elhassan departed the commercial area near the airport and drove northbound on Interstate 95. He was surveilled by law enforcement agents as he proceeded on Interstate 95.

After several other efforts at avoiding scrutiny, Farrokh entered the airport terminal and proceeded to check-in for his flight to Jordan, *via* Chicago. Upon checking in, Farrokh cleared through the departure security area carrying two bags.   Farrokh was arrested by the FBI as he was approaching his departure gate.

Subsequent to Farrokh's arrest, FBI agents approached Elhassan that afternoon at a location in Woodbridge, Virginia, where he voluntarily consented to an interview. During the course of the interview, Elhassan verbally acknowledged to the interviewing agents more than once that he knew it was illegal to knowingly lie to federal agents.  He then proceeded to make numerous false statements in response to the agents' questions. Elhassan admitted knowing Farrokh and stated that he had first met Farrokh

10

approximately two months ago and that the two would occasionally talk by telephone. When asked when he had last seen Farrokh, Elhassan told the agents that it had been around 11:30 a.m. that day in the Woodbridge, Virginia area.  He further stated that Farrokh was going to the airport to fly to California to attend the funeral of a friend and that Farrokh had told him that he would be gone for two weeks. When asked which airport Farrokh was departing from, Elhassan initially hesitated then said that Farrokh was flying out of Dulles airport. At the conclusion of the interview, Elhassan was placed under arrest.

### III.   The Applicable Guidelines Range Is Correctly Calculated at 360 months to Life, with a Restricted Statutory Cap at 336 months.

   1.   The Probation Officer's Report and Calculation of the Sentencing Guidelines.

The United States has reviewed the Presentence Investigation Report (PSR) and we have no corrections or objections to the PSR.   The PSR properly calculates a base offense level of 37 at criminal history category VI, based upon the guidelines requirement that the terrorism enhancement (§3A1.4(a)) and the automatic calculation of criminal history category VI (§3A1.4(b)) is applied based on the facts of this case.   Further, the government agrees that the probation officer has properly assessed an obstruction of justice enhancement pursuant to §3C1.1.   The Guidelines recommend a sentence of 360 months to Life Imprisonment.   However, the Guidelines are restricted in this case to the statutory maximum sentence of 336 months.

   2.   Sentencing Law

As this Court is aware, after *United States v. Booker*, 543 U.S. 220 (2005), the district court must engage in a multi-step process in sentencing a defendant.   First, the court must

11

correctly determine, after making appropriate findings of fact, the applicable guideline range. *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).   In doing so, the Court must make factual findings, supported by a preponderance of the evidence, to support any pertinent guidelines enhancements.   *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009); *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004). *cf United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004) (No plain error when District Court applied preponderance of the evidence standard at a sentencing hearing for terrorism enhancement.)    "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"   *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).

That the Sentencing Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence.   "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.   *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Abu Ali*, 528 F.3d 210, 260 (4th Cir. 2008).   Indeed, given the Sentencing Commission's important institutional role and expertise, the recommended guidelines range typically will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."   *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)); *Unites States v. Lymas*, -- F.3d --, 2015 WL 1219553, at *4 (4th Cir. Mar. 18, 2015).   The district court must therefore "consider the guideline range applicable to the defendant and pertinent policy statements of the Sentencing Commission."   *United States v.*

*Perez-Pena*, 453 F.3d 236, 241 (4th Cir. 2006); *see also United States v. Hughes*, 401 F.3d 540, 548 (4th Cir. 2005) ("In the wake of *Booker* . . . a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" (quoting *Booker*, 543 U.S. at 264)).   And, if the district court imposes a sentence outside the guideline range, the court must explain its reasons for the variance as required by 18 U.S.C. § 3553(c)(2).   *Id.*; *see also United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009); *Abu Ali*, 528 F.3d at 260 ("If the sentencing court believes 'an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" (quoting *Gall*, 552 U.S. at 597[10])); *United States v. Moreland*, 437 F.3d 424, 434 (4th Cir. 2006) ("The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be.").

The United States is witnessing a disturbing trend in the imposition of sentences in terrorism cases that are between 40% to 60% below the minimum recommended Guidelines sentence (which are often already restricted at the statutory maximum penalty).   Variance sentences of this magnitude cannot not properly weigh the public safety interests of these violent crimes.[11]   The "overarching provision" within the sentencing statutory framework is congress's instruction to the district courts to impose a sentence "`sufficient, but not greater than necessary` to accomplish the goals of sentencing, including to reflect the seriousness of the offense….

*Kimbrough v. United States*, 552 U.S. 558, 570 (2007)(listing all of the 3553(a) factors).   In

---

[10] "We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.*

[11] Several 3553(a) factors address public safety or otherwise the promotion of a peaceful society: (i) "nature and circumstances of the offense;" (ii) "seriousness of the offense;" (iii) "promote respect for the law;" (iv) "just punishment;" (v) "adequate deterrence to criminal conduct;" (vi) "protect the public from further crimes of the defendant."

addressing the 3553(a) factors, the Court must reach the "sufficiency" clause before addressing the greater than necessary clause.

Defendants convicted of material support for terrorism pursuant to 2339B, and related terrorism statutes, are engaging in a unique and violent brand of criminality.   Reflexively untethering these crimes from the Guidelines does not further the interests of justice, nor does it properly follow the Supreme Court's guidance, nor does it properly account for statutory balancing framework set forth in 3553(a).

     3.   The Terrorism Enhancements in U.S.S.G. §3A1.4(a)-(b) are Properly Applied.

The probation officer properly applied the 12 level offense conduct adjustment in U.S.S.G. §3A1.4(a), and the application of criminal history category VI set forth in U.S.S.G. §3A1.4(b).   The defendant does not contest this application.   Indeed, the application of terrorism enhancements in this case are "straightforward."   *See United States v. Benkhala*, 530 F.3d 300, (4th Cir. 2008) (holding that enhancement was proper because defendant "attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both") *cf. United States v. Chandia*, 514 F.3d 365, 376 (sentencing remanded to District Court where court "appeared to assume (erroneously) that the enhancement automatically applies to a material support conviction" and so "did not make any factual findings related to the intent element.") *cf. United States v. Hammoud*, 381 F.3d 316, 355 (4th Cir. 2004) (No plain error when District Court applied preponderance of the evidence standard at a sentencing hearing for terrorism enhancement.)

The uncontroverted evidence established by (1) the plea colloquy in this matter, (2) the pre-sentence investigation report, and (3) the expressed statements of the defendant, amply

demonstrates that the defendant intended to commit a federal crime of terrorism.   First, in accepting the defendant's guilty pleas on October 24, 2016, the Court accepted the sworn affidavit of the defendant in which he admits his conduct to both the §2339B offense and the terrorism related false statements offense.   The defendant admitted he knew the Islamic State was a designated foreign terrorist group.   See PSR ¶7, subparagraph 3.   A conviction under §2339B requires the government to prove the defendant's "knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism." 18 U.S.C. §2339B(a)(1). A defendant who has been convicted of providing material support to an FTO may be subject to the enhancement if the evidence establishes that he provided such support with the "intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Chandia*, 524 F.3d 365, 376 (4th Cir. 2008).

Further, at the Rule 11 hearing held on October 24, 2016, the Court asked the government to recite the facts it would have proven beyond a reasonable doubt had the matter gone to trial. Among other facts, the government proffered the following:

> "Between August and January – August 2015 and January 2016, the defendant and Mr. Farrokh had numerous conversations about the upcoming travel and the preparations and what Mr. Farrokh would do there.   A number of the conversations were violent in nature expressing a desire to go over there and chop heads, fight against the U.S. military, etc."

Transcript, October 24, 2016, p. 17, lines 14-20.   At the conclusion of the recitation of facts, counsel for the defendant said the only disputed fact was the government's assertion that the co-defendant's scheme involved the defendant travelling to Syria and Iraq at a later date to join Farrokh.   The Court then had the following exchange with the defendant:

THE COURT:   All right.   Mr. Elhassan, would you come forward, please. I understand from your counsel that you dispute any claim or any recitation that you had agreed to go overseas yourself or that you had indicated that you would do so.   Other than any of the facts that Mr. Fitzpatrick mentioned relating to that issue, do you dispute anything else that the government has told the Court?

THE DEFENDANT: No, Your Honor.

Transcript, October 24, 2016, page 21, lines 15-19.   Further, the Court had the following

exchange with the defendant concerning his knowledge:

THE COURT: In Court 2 of the indictment, it states that you know that ISIL was a designated foreign terrorist organization, that ISIL engages and has engaged in terrorist activity, and that ISIL engages and has engaged in terrorism.   Do you agree that that is a correct statement of your knowledge?

THE DEFENDANT:   yes, your Honor.

Transcript, October 24, 2016, page 23, lines 8-15.

Second, the PSR is replete with uncontested evidence that the defendant knew he was

pleading guilty to a federal crime of terrorism as that term is defined by statute.   Again, the

Islamic State's entire reason for being is to (1) forcibly take land in Syria, Iraq and elsewhere, (2)

draw the United States into battle, and (3) encourage "lone wolf" actors aligned with the Islamic

State to commit terrorist attacks in the United States in order to influence, intimidate or coerce

the government.   Within the PSR, we know the following:

1.  The defendant sought out Cooperator 1 in order to become introduced to people who could facilitate travel to ISIL controlled territory.   The defendant knew that Cooperator 1 had for years ran an organization that operated internet platforms and websites containing postings and information supportive of violent jihad.   PSR ¶¶ 8,11.

2.  The defendant had been using various internet sites … to support and espouse violent

16

jihad since shortly after his arrival in the United States in 2012.   PSR ¶ 11.

3. On one of his Facebook pages, the defendant's profile was a black jihad flag associated with Islamic extremist groups. PSR ¶ 11

4. The defendant posted videos supporting terrorism.   PSR ¶ 11

5. The defendant posted a comment that "he wished to work with him some day" referring to a violent extremist who railed against "the infidel status of Christians and Jews."   PSR ¶ 11

6. The defendant communicated with Al-Jazouly and informed Farrokh of his contact with Al-Jazouly.   PSR ¶ 12.

7. The defendant repeatedly lied to the FBI when confronted about his conduct, demonstrating his consciousness of guilt. PSR ¶¶ 27,28.

Third, the expressed statements of the defendant set forth in the introduction reflect that the defendant intended to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct.   For instance, this statement perfectly reflects the defendant's intent: *Allah commanded us to fight- and fighting is not throwing candies but necks being chopped off and stomachs being slashes (sic) and eyes poked!*

This record contains overwhelming evidence of the defendant's intent to commit a federal crime of terrorism.   As the Fourth Circuit has plainly stated, "the terrorism enhancement is doing just what it ought to do: Punish[ ] more harshly than other criminals those whose wrongs served an end more terrible than other crimes." *United States v. Benkhala*, 530 F.3d 300, (4th Cir. 2008).

4. Defendant's Argument for a Mitigating Role Departure Pursuant to U.S.S.G. §3B1.2 is Unsupported and Should be Rejected.

As expected, and as reflected in the defendant's acceptance of responsibility, the defendant attempts to argue that Joseph Farrokh is the more culpable defendant in this case. As this memorandum argues elsewhere, that assertion is false. The defendant was not a minimal participant (§3B1.2(a)) or a minor participant (§3B1.2(b)). The defendant played a motivating and aggressive role in this case. The defendant was radicalized long before Joseph Farrokh. The defendant sought out Cooperator 1 for the purpose of learning how to support the Islamic State. The defendant sought out Sheikh Al-Jazouly, the Sudanese cleric whose entire reason for being is to promote violent jihad. Finally, the probation officer is correct that if we accept the defendant's characterization that the defendant was a recruiter, which he surely was and more, then that actually supports an *aggravating* role adjustment upward. Instead, the Court should reject the defendant's argument for a mitigating role downward adjustment.

5. The 18 U.S.C. § 3553(a) Sentencing Factors Support a Guidelines Sentence.

Under 18 U.S.C. § 3551, a defendant must be sentenced "in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case." This mandate is repeated in the first sentence of § 3553(a), which provides: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." This section then states that in determining a particular sentence, a sentencing court must consider certain enumerated factors. Thus, § 3553(a) serves two functions:

> First, it prescribes that every sentence comply with the four announced *purposes* for sentencing. Second, it lists seven *factors* that a court must consider in determining a particular sentence, and included as one of the factors is the list of announced purposes for sentencing in § 3553(a)(2).
>
>            *   *   *   *
>
> The proper application of § 3553(a) therefore requires a sentencing court to focus on the four *purposes* of sentencing, as applicable in a particular case, and to consider, in determining a sentence that achieves those purposes, the seven *factors* listed in § 3553(a)(1)-(7).

*United States v. Shortt*, 485 F.3d 243, 247-48 (4th Cir. 2007) (emphasis in original).   These factors, however, can themselves overlap.   *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006) (comparing, for example, promoting respect for the law under § 3553(a)(2)(A) and affording adequate deterrence under § 3553(a)(2)(B)).

       In this case, the § 3553(a) factors are consistent with a Guidelines sentence.   Of particular significance for this case are the factors addressing public safety: (1) the nature and circumstance of the offense, (2) the need for the sentence imposed to reflect the seriousness of the offense, (3) promotion of respect for the law; (4) just punishment; (5) adequate deterrence to criminal conduct; (6) protect the public form further crimes of the defendant.

       A.     <u>The Public Safety Factors</u>.

           i.     *nature and circumstances of the offense and seriousness of the offense.*

       It is impossible to understand the severity of the defendant's conduct outside of the context of the terrorist group he seeks to support.   For this reason, the government sets forth in stark terms in its memorandum the graphic description of ISIL.   The ease with which the defendant gravitated towards this brutal terrorist organization is alarming.   The defendant was active online espousing the virtues of the terrorist organization, expressing his own views about

the organization, and actively seeking to assist the organization.   At different times, the defendant characterized himself as a "sleeper cell" and as a "solo wolf."   These are loaded terms meant to intimidate and incite and they accurately reflect the defendant's motivation.

Finally, the defendant's repeated lies to the FBI on the same day he delivered Farrokh to the airport demonstrates someone who was committed to making the plan work.   The defendant could have acknowledged to the FBI the seriousness of this conduct.   He made a different choice.   He chose allegiance to the Islamic State cause over allegiance to the truth.

A Guidelines sentence reflects the seriousness of this offense and society's contempt for the defendant's conduct.

> ii.   *promote respect for the law, just punishment, deterrence, and protect the public from further crimes of the defendant.*

As a general matter, terrorism crimes in this era are properly viewed as one of the more serious classes of crimes in criminal justice.   Recent events within the last five to seven years have demonstrated the enormous toll in loss of life terrorism crimes create in communities across the country.   Further, with the spread of the poisonous ideology into the internet and social media, the jihadist philosophy shows no sign of abating.   A lengthy sentence recommended by the Guidelines would send an appropriate message to the public that we are guided by the rule of law.

The importance of this factor cannot be overstated.   A substantial sentence in this case would send an appropriate and much needed message to all persons harboring any notion that serving, joining or aiding the Islamic State in any manner is worthwhile.   It is abhorrent conduct.   Strong punishments for this conduct send the appropriate message to others, *i.e.*, that

providing support to terrorist organizations will be pursued aggressively, and those who violate the law in this manner will be tried, convicted, and punished accordingly.

In a free, open, and vibrant democracy, tough sentences for violent crimes achieve justice by allowing the people to live freely without fear, violence and intolerance.   Fidelity to the rule of law, and respect for the law, is a hallmark of American democracy.   As applied to this defendant, in his short time in the United States he has demonstrated no respect for the law.   A lengthy sentence would certainly send the appropriate message to this defendant.

## IV.    CONCLUSION

The defendant's state of mind and conduct in this case were egregious and go to the heart of the safety of our community and the nation.   After a fair evaluation of the defendant's conduct, the nature and circumstances of the case, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the government submits that a substantial sentence that is rationally and reasonably compatible with the United States Sentencing Commission Guidelines is warranted in this matter.

Respectfully submitted,

Dana J. Boente
United States Attorney

By    _____/s/_____

Dennis M. Fitzpatrick
Assistant United States Attorney
Attorneys for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Dennis.fitzpatrick@usdoj.gov

21

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2017, I caused an electronic copy of the foregoing

pleading to be filed and served via ECF on all counsel of record in this matter.


By          _____/s/_____
Dennis M. Fitzpatrick
Attorney for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314